**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Theresa A. Kovacs,                                          Case No. 22-cv-2151

        Plaintiff,

    v.                                                          **ORDER**

University of Toledo,

        Defendant.

This is a retaliation case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. (Doc. 1). Defendant, the University of Toledo ("UT") is a state university. Plaintiff was an employee of the Defendant until her termination. Whereupon she filed this lawsuit.

On August 14, 2023, Defendant moved for summary judgment. (Doc. 18). On September 13, 2023, Plaintiff has filed an opposition[1] (Doc. 31) and on October 17, 2023, Defendant filed a reply (Doc. 33).

**1. Background**

    **a.    Undisputed Facts**

Plaintiff began working for Defendant's Human Resources ("HR") Department in 2003 as a Senior Benefits Specialist. (Doc. 14-1, PageID. 151–152). Over approximately 18 years, Plaintiff held different positions within the HR Department. (Doc. 18, PageID. 1048; Doc. 31, PageID. 2693). In April 2018, Defendant promoted Plaintiff to the position of Director, HR Academic, Student Services & Administration. (Doc. 18, PageID. 1048; Doc. 31, PageID. 2693).

---

[1] After initially filing an opposition (Doc. 27), Plaintiff filed an amended opposition (Doc. 31).

Plaintiff reported to former Associate Vice President and Chief Human Resources Officer Wendy Davis, who is Black. (Doc. 18 at 1048; Doc. 31 at PageID. 2698). Davis reported to Defendant's Executive Vice President for Finance and Administration and Chief Financial Officer Matthew Schroeder. (Doc. 18 at PageID. 1048; Doc. 31 at PageID. 2694). Schroeder, in turn, reported directly to UT's president, Gregory Postel. (Doc. 18, PageID. 1048; Doc. 31, PageID. 2692).

Defendant hired Postel as its Interim President in July 2020. (Doc. 18, PageID. 1049). UT contends that one of Postel's initiatives upon acting as University President was to modernize its HR Department. (Doc. 18, PageID. 1049).

On September 22, 2020, two months after Postel became president, Schroeder announced that UT terminated Davis. (Doc. 18, PageID. 1048; Doc. 31, PageID. 2698). Defendant hired John Elliott and Melissa Hurst (both of whom are Caucasian) as Davis' replacements. (Doc. 18, PageID. 1048).

In October 2020, before Davis' last day, but after Defendant notified Davis of her removal, Davis conducted Plaintiff's annual performance review. (Doc. 31, PageID. 2694; Doc. 33, PageID. 2729). Consistent with Davis' prior reviews of Plaintiff, Plaintiff received an overall rating of 4.[2] (Doc. 31, PageID. 2693 (citing Doc. 25-1, PageID. 2613)).

Plaintiff began reporting to Elliott after Davis' removal. (Doc. 18, PageID. 1049). Then, beginning in mid-October 2020, Plaintiff began reporting to Hurst. (*Id*.; Doc. 31, PageID. 2700).

On November 6, 2020, approximately two months after having assumed their positions in September 2020, Elliott and Hurst notified Plaintiff that effective December 1, 2020, they were demoting her to the position of Senior HR Consultant. (Doc. 18, PageID. 1052; Doc. 31, PageID.

---

[2] At the time, the University used a five-point scale and five was the highest possible rating.

2697). Plaintiff's compensation remained the same. (Doc. 18, PageID. 1052). Neither party disputes that Elliott and Hurst told Plaintiff that the main reason for her demotion was that she was not effective in a leadership role. (Doc. 18, PageID. 1052; Doc. 31, PageID. 2697).

On January 4, 2021, Plaintiff began reporting to Jason Beck, whom she previously supervised before her demotion. (Doc. 18, PageID. 1053). About one month later, on February 9, 2021, Elliott gave Plaintiff a 90-day termination notice. (Doc. 18, PageID. 1055; Doc. 31, PageID. 2700.) Elliott told Plaintiff that UT was terminating her because the University was "going in a new direction." (Doc. 31, PageID. 2700 (citing Doc. 14-1, PageID. 341)).

Plaintiff stopped working on February 9, 2021. (*Id*.) She received full pay through May 9, 2021. (*Id*.)

In her Complaint, Plaintiff alleges that the Equal Employment Opportunity Commission ("EEOC") notified her of her right to sue on September 2, 2022. (Doc. 1, PageID. 2). She alleges she filed suit within the 90-day deadline for doing so. Plaintiff did not provide a copy of her EEOC right-to-sue letter; however, Defendant does not challenge exhaustion or the timeliness of her complaint.

Plaintiff filed her two-count Complaint on November 30, 2022. (Doc. 1). On December 29, 2022, Defendant filed an Answer. (Doc. 4). On January 18, 2023, the parties stipulated to dismissal of one of Plaintiffs' two claims. (Doc. 7). I granted the stipulation at a January 23, 2023 Status Conference. (*See* 1/23/2023 Minute Entry).

b.     **Disputed Facts: Plaintiff's Position**

The dispute in this case regards the reason for Plaintiff's termination. Plaintiff argues that UT fired her in violation of Title VII as retaliation for opposing an unlawful employment practice.

3

(*See* Doc. 1, PageID. 1). Defendant denies these allegations, arguing that it terminated Plaintiff for legitimate and non-retaliatory purposes. (*See* Doc. 4, PageID. 67).

Plaintiff's position is that her job performance for eighteen years at UT was exemplary. (*See e.g.*, Doc. 31, PageID. 2693). Then, beginning in September 2020, several events described below occurred.

First, a Defendant employee, James Toth, who worked closely with Schroeder, decided to promote another employee, Tracey Brown, to a new position. (*Id*. at PageID. 2695.) Toth wanted to give Brown a new position without first posting the position publicly. (*Id*.) The promotion would change Brown's status from a union to a non-union job and would provide Brown with a raise. (*Id*.)

On September 10, 2020, Schroeder asked Wendy Davis about Toth's proposal to promote Brown. (*Id*.) On October 5, 2020, Schroeder's direct report, Sabrina Taylor, called Plaintiff to check on the status of Brown's promotion. (*Id*.) Plaintiff told Taylor that there were problems with the proposal to promote Brown. (*Id*.) Plaintiff told Taylor that some of these problems involved the union, the Office of Federal Contract Compliance Program, and Equal Employment Opportunity ("EEO") laws.  (*Id*. at PageID. 2695–2696). She also told Taylor that Toth's proposal could have a "disparate impact" on minorities or other non-white applicants. (*Id*. at PageID. 2696).

The next day, on October 6, 2020, Schroeder called Plaintiff about Brown's promotion. (*Id*. at PageID. 2696). Plaintiff told Schroeder about the problems she identified with Toth's proposal to promote Brown. (*Id*.)

On October 12, 2020, Schroeder and Plaintiff spoke again. (*Id*.) Plaintiff repeated the same concerns that she had already expressed in their last discussion. (*Id*.)

4

On October 20, 2020, Plaintiff emailed Elliott, her then-new supervisor. (*Id*.) In her email, Plaintiff explained her concerns with Toth's proposal to promote Brown. (*Id*.) She wrote:

> Moving Tracey to the contract specialist position at this time places UToledo in a compromising legal position as she does not meet the minimum (basic) qualifications. Promoting an employee that does not meet the minimum qualifications goes against EEO. To keep the process fair and equitable, the OFCCP states to help keep everybody on the same page, carefully craft a job description for the position, not for a person you would like to promote. The OFCCP also states the basic qualifications which an applicant must possess means qualifications that the employer advertised to potential applicants or criteria which the employer established in advance.
>
> To avoid potential disparate impact (disparate impact is often referred to as unintentional discrimination), nonetheless, our practices must be uniformly and consistently applied.
>
> To remain compliant with established minimum qualifications, it would be best to move Tracey into the proposed project assistant role; (changing the title to project specialist), redo the proposed job description to align with the contract specialist (and not reading anything like the office assistant 3).

(*Id*. (citing Doc. 15-1, PageID. 649–651, 709–710) (errors in original)).

That same day, Plaintiff participated in a call with Toth, Elliott, and two others about the proposal to promote Brown. She repeated her concerns. (*Id*. at PageID. 2697).

Plaintiff alleges that Toth and Elliott did not agree with or approve of Plaintiff's concerns. (*Id*.) Instead, they approved Brown's promotion. (*Id*.)

On November 6, 2020, seventeen days after the last time she expressed her concerns, Elliott and Hurst met with Plaintiff. (*Id*.) At the meeting, Elliot and Hurst told Plaintiff she was demoted. (*Id*.) Elliott and/or Hurst told Plaintiff that she was being demoted because she was not a good leader. (*Id*.)

Plaintiff argues that the real reason Defendant demoted her was in retaliation for her complaints about Brown's promotion.

She also explains that, starting in fall of 2020, Defendant fired five Black employees. (Doc. 1, PageID. 9–10). All five terminated individuals later filed charges with the Ohio Civil Rights Commission. (*Id*.) The Commission found probable cause that Defendant discriminated against all five former employees based on race. (*Id*.)

By February 2021, the University had already fired three Black HR employees. They were Wendy Davis, discussed above, Dreyon Wynn and Carolyn Chapman. Wynn was the Defendant's Director of Employee/Labor Relations and HR Compliance. (Doc. 31, PageID. 2698). Chapman performed the same duties for Defendant as Plaintiff, except Chapman was on Defendant's Health Science Campus. (Doc. 18, PageID. 1048).

In January 2021, Elliott fired Wynn. (*Id*.). Wynn contacted Defendant's Vice President of Diversity and Inclusion (the "VP"). Wynn told the VP that Defendant had recently fired three Black HR employees: himself, Davis, and Chapman. He also told the VP that Plaintiff, who is white, was demoted instead of fired, and Plaintiff maintained her same pay rate. UT did not offer any of the terminated Black HR employees the option to accept a demotion for the same pay, as it had for Plaintiff. Wynn believed race discrimination was the reason for UT's different treatment of Caucasian and Black employees.

Wynn also emailed President Postel and a member of Defendant's Board about his termination and his concerns about discrimination.

The VP met with Schroeder about the issues Wynn raised. The VP also met with President Postel. A meeting agenda item for their discussion was "HR terminations." President Postel told the VP that he would talk to Schroeder about the terminations.

On February 9, 2023, Elliot fired Plaintiff. Plaintiff notes that UT fired her just "fourteen days after Wynn first notified several members of the University's administration (including

6

President Postel) that [Plaintiff] was a white comparator to [Wynn], Chapman, and that people of color in the HR Department had suffered discrimination at the hands of Matt Schroeder." (Doc. 31, PageID. 2700.)

In sum, Plaintiffs' position is that first, her demotion occurred only after she raised concerns about promoting Brown without a public posting and the potential long-term deleterious "disparate impact" this could have on minority UT applicants. (*Id*. at PageID. 2714). Second, Plaintiff argues that Defendant would have terminated her for voicing her concerns over Brown's promotion, but because she is Caucasian, she was treated favorably and demoted. (*Id*.) Third, she argues that, once the University higher-ups became aware that Black HR employees were fired while Plaintiff was merely demoted, UT made the decision to fire Plaintiff. (*See* Doc. 31, PageID. 2714). Plaintiff states, "The University thought it could protect itself from the race discrimination charges from Davis, Chapman, and Wynn if it also terminated a white HR Director—Kovacs." (Doc. 31, PageID. 2716).

### c.    **Disputed Facts: Defendant's Position**

After Defendant hired President Postel in July 2020, Postel announced that one of the University's priority initiatives was HR modernization. (Doc. 18, PageID. 1049 (citing Schroeder Dep. Trans., Doc. 17-1, PageID. 940– 942)); *and see, UToledo President—Dr. Gregory Postel; Tackling Challenges: 2020-22 Key Initiatives*, *https://perma.cc/WM3E-T9CY*.  Schroeder and Elliott worked closely with Postel to implement this initiative. (*Id*.) Schroeder testified in his deposition that the reason for this undertaking was the HR Department's negative reputation among University employees for being "a bureaucracy," that was "essentially pushing paper." (*Id*.; citing Schroeder Dep. Trans., Doc. 17-1, PageID. o941).

7

One of the first steps that Defendant took in the HR modernization process was hiring Elliott and Hurst. (*Id*. at PageID. 1046, 1049). Once hired, Elliott and Hurst began assessing HR's staffing, performance, and other processes. (*Id*.). Elliott came to believe that Plaintiff's department was generally slow to respond, had no development plans, no employee evaluations or improvement plans, and no vision or strategy for building and improving on its performance. (*Id*. at PageID. 1050).

Hurst adopted a similar attitude towards Plaintiff's department. (*Id*.). Plaintiff, as the department Director, was responsible for managing and supporting her department. (*Id*.).

Hurst assigned Plaintiff to manage two projects: (1) evaluating, formalizing, and managing Defendant's separation process; and (2) implementing a quarterly personnel action report for submission to Defendant's Board. (*Id*. at PageID.1050–1051).

Hurst believed that the first project would take Plaintiff approximately two to three weeks. (*Id*. at PageID. 1051). Plaintiff never completed the first project. Despite several prompts and requests for updates, Plaintiff likewise never completed the second project in a timely manner.

Defendant states that Plaintiff's poor performance on these two projects led to her demotion on November 6, 2020.

Plaintiff was no longer a supervisor after her demotion. (*Id*.) Plaintiff also began reporting to Jason Beck, who Plaintiff previously supervised. (*Id*.) After Plaintiff's demotion, Defendant assigned her to mentor and train two other employees. (*Id*. at PageID. 1053).

Plaintiff told both her supervisor, Hurst, and Beck himself that she thought it was "bullshit" that Beck was her supervisor. (*Id*.) Plaintiff also stopped attending meetings and "disengaged" with her co-workers. (*Id*. at PageID. 1054). Additionally, the two employees Defendant assigned to Plaintiff to mentor complained that Plaintiff was not training them properly. (*Id*.)

8

Around this time, Plaintiff approached Defendant's Labor Relations Director and indicated that she was not busy and that she wanted a new role. (*Id*.) The Labor Relations Director reported Plaintiff's comment to Elliott and Hurst. (*Id*.) This, Elliott later testified, was the last straw. Elliott believed that this demonstrated "Plaintiff had no intention of embracing her new role, especially considering her area was understaffed." (*Id*. at PageID. 1055).

Per Defendant, Beck made the decision to terminate Plaintiff. (Doc. 18, PageID. 1055). Hurst and Elliott agreed with Beck's decision. (*Id*.) On February 9, 2021, Elliott and Beck gave Plaintiff her ninety-day termination notice. (*Id*.)

## 2. **Legal Standard**

Defendants have moved for summary judgment on all claims. Established law provides that summary judgment is appropriate where the evidence presented in the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If satisfied, then the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). I draw all justifiable inferences from the evidence presented in the record in the light most favorable to the non-moving party. *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 245 (6th Cir. 1997).

For the reasons that follow, I grant Defendant's motion in part and deny it in part.

### 3. Discussion

#### a.    Prima Facie Case of Retaliation

Defendant argues that Plaintiff fails to establish a prima facie case of retaliation. Section §

2000e–3(a) of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Thus, this section prohibits an employer from retaliating against an employee who has

"opposed" any practice by the employer made unlawful under Title VII. *Johnson v. Univ. of*

*Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000).

The Sixth Circuit explains the elements of a retaliation claim:

> To establish a *prima facie* case of retaliation under Title VII, Plaintiff must demonstrate that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Jones v. Johanns,* 264 Fed. App'x 463, 466 (6th Cir. 2007) (citing *Abbott v. Crown Motor Co., Inc.,* 348 F.3d 537, 542 (6th Cir. 2003), and *Burlington N.,* 548 U.S. at 67–68, 126 S.Ct. 2405 (modifying the third element to require a "materially adverse action" rather than an "adverse employment action")). Title VII retaliation claims "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* —— U.S. ——, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013).

*Laster v. City of Kalamazoo*, 746 F.3d 714, 729–731 (6th Cir. 2017).

If the plaintiff sets forth a *prima facie* showing of these elements, then the burden shifts to

Defendant to "articulate some legitimate," non-retaliatory reason for its actions. *Dixon v.*

*Gonzales,* 481 F.3d 324, 333 (6th Cir. 2007) (quotation marks and citations omitted). "If the

defendant satisfies its burden of production, the burden shifts back" to Plaintiff to demonstrate that Defendant's proffered reason was not the true reason for the employment decision. *Id*. This is known as the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." *Dixon*, *supra*, at 333.

Defendant challenges Plaintiff's prima facie showing of the first and fourth elements of retaliation: (1) that Plaintiff engaged in a protected activity; and (2) that Plaintiff has set forth a causal connection between the protected activity and the materially adverse action. (*See* Doc. 18).

**Protected Activity**

Plaintiff argues that she engaged in a protected activity under Title VII. "[O]pposing any practice that the employee reasonably believes to be a violation of Title VII" constitutes protected activity. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). A complaint to management about discriminatory employment practices can constitute protected activity. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 344–45 (6th Cir. 2021) (citing *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008)). A plaintiff need not make such a complaint "with absolute formality, clarity, or precision," but the complaint must go beyond a "vague charge of discrimination." *Jackson, supra*, 999 F.3d at 345 (quoting *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015)).

Plaintiff argues that when she voiced her concerns with the proposal to promote Brown to a newly-created position without publicly posting the job opening first, this qualified as a protected activity. Plaintiff details the five communications where she stated her concerns. They are: (1) the October 5, 2020 call with Taylor, where Plaintiff told Taylor that there were issues with the proposal to skip public posting of the position, including problems under Equal Employment

Opportunity laws and the potential disparate impact on minorities or non-white applicants; (2) the October 6, 2020 discussion with Schroeder, where Plaintiff repeated those same concerns; (3) the October 12, 2020 discussion with Schroeder, where Plaintiff discussed the potential "disparate impact on minorities" if the job was not publicly posted; (4) the October 20, 2020 email to Elliott, which again discussed both Equal Employment Opportunity laws and "a potential disparate impact, also known as unintentional discrimination;" and (5) the October 20, 2020 discussion with Toth, Elliott, and Wynn in which she repeated her same concerns.

Defendant argues that none of these communications constitute a protected activity because promoting Brown without posting the new position publicly does not actually violate the law under Title VII. More specifically, Defendant argues that it should prevail because Plaintiff's belief that the law required the new position to be posted publicly was incorrect and unreasonable. (Doc. 18, PageID. 1060).

I disagree with Defendant. "Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee *reasonably believes* to be a violation of Title VII." *Johnson*, *supra*, 579 (emphasis added). In other words, "the *only* qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of his opposition must be reasonable." *Id*. at 580 (emphasis added). Moreover, the Sixth Circuit has long-held that: "A person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312–13 (6th Cir. 1989).

Here, Plaintiff voiced her belief that failing to publicly post the position would violate EEOC laws and would have a potential disparate and discriminatory impact on minority

12

applicants. *Booker* clearly states that whether she was actually right or wrong about her belief is not dispositive. Rather, Plaintiff need only have a "good faith belief" that Defendant's failure to post the job was unlawful. Plaintiff's five communications, all similar to one another in content, support her argument that she had a good faith belief that she was correct.

Defendant cites to two cases, which it incorrectly states foreclose Plaintiff's argument. The first case is *Brinson v. Summit County,* No. 21-cv-1638, 2023 WL 4085306 (N.D. Ohio June 20, 2023) (Lioi, C.J.). In *Brinson*, the defendant terminated the plaintiff from his position as director of diversity at the Summit County Sheriff's office. The plaintiff alleged, among other things, that his termination was retaliatory in violation of Title VII. The plaintiff argued that when he tried to provide diversity and inclusion training in the defendant sheriff's office, the defendant fired him.

Before the defendant fired the plaintiff, the plaintiff and the sheriff held a meeting about another employee who had raised allegations of race discrimination. The sheriff instructed the plaintiff to take "a softer approach" to race-based inequity allegations. *Id.* at * 8. The plaintiff interpreted the "softer approach" direction to mean that the sheriff was entirely prohibiting the plaintiff from addressing race inequity. *Id.* He sent the sheriff an email summarizing this interpretation of their discussion. The topic of race was, in the plaintiff's words, "off the table." *Id.* But other than the "softer approach" discussion, the plaintiff did not have any other evidence that he was entirely prohibited from addressing race discrimination.

Chief Judge Lioi, in evaluating whether the email was protected opposition activity under Title VII, found that the email "does not amount to any reasonable opposition to discriminatory practices." *Id.* at * 15. Judge Lioi stated, that "at most," the plaintiff "was opposing resistance to his specific plan for addressing racial inequalities at the Sheriff's Office." *Id.* Accordingly, the plaintiff's email did not qualify as opposition to a discriminatory practice under Title VII; rather,

13

it reflected a disagreement over the plaintiff's approach to performing his job duties. The plaintiff set forth no other evidence besides his own conclusions that he, as the director of diversity, was restricted from addressing race. This was not enough to constitute a protected activity.

The present case is different. Here, Plaintiff had five separate discussions with several Defendant employees about her belief that failing to post the position would violate EEOC laws and have a disparate impact on minority applicants. Unlike the plaintiff in *Brinson*, Plaintiff here was not addressing Defendant's feedback on her job performance. Nor is there any evidence that Defendant took issue with the way in which Plaintiff communicated her concerns. Accordingly, I reject Defendant's argument that *Brinson* is on all fours with this case.

I also reject Defendant's argument that *Holden v. Owens-Illinois, Inc*. is analogous. *Holden*, 793 F.2d 745 (6th Cir. 1986). In *Holden*, the plaintiff worked for the defendant as its affirmative action program manager. *Id*. at 746. One of her job duties was to "design and implement affirmative action programs" to comply with an Executive Order. *Id*. After six months of unsuccessfully trying to design and implement an affirmative action program, the defendant fired the plaintiff. *Id*. The Plaintiff argued that she was fired for retaliatory reasons.

The Sixth Circuit held that because Title VII does not mandate affirmative action programs, the plaintiff's attempts to implement an affirmative action plan were not protected activities under Title VII's opposition clause. *Id*. The Sixth Circuit also noted that the plaintiff's unsuccessful performance of her job duties does not qualify as "opposition" in any event. *Id*. at 749. Rather, the plaintiff's activities were simply unsuccessful efforts to perform her job functions. *Id*. at 751. Just because her job functions happened to involve affirmative action did not automatically qualify all of her actions as protected under Title VII. *Id*.

14

Plaintiff here was not charged with implementing an affirmative action program. Rather, she opposed a hiring process that she believed was discriminatory towards minorities and in violation of EEOC law.[3] Moreover, in the case *Johnson v. Univ. of Cincinnati*, the Sixth Circuit clarified that "the scope of *Holden* extends "only to an employee who protests the implementation of [an] affirmative action program." *Johnson*, supra at 579. Therefore, I find that *Holden* does not apply to this set of facts.

Next, Defendant incorrectly argues that Plaintiff needed to know Brown's race before she could take a stand against a hiring practice involving Brown. Defendant makes much of the fact that, even at the time of her deposition, Plaintiff did not know Brown's race. This argument misses the mark.

First, Plaintiff's concerns over Brown's promotion did not stem from Brown's race, whatever it may be. Rather, Plaintiff was concerned about whether the failure to post a job publicly, which Plaintiff believed the law required, would have a disparate impact on the diversity of applicants other than Brown.

Second, the cases that Defendant cites for the proposition that Plaintiff needed to know Brown's race before she could take an overt stand against racism are Americans with Disabilities Act ("ADA") cases, not Title VII cases. (*See* Doc. 18, PageID. 1061 (citing *Persinger v. Indus. Fabricators, Inc.*, No. 2:19-cv-4583, 2021 WL 4288363 (S.D. Ohio Sept. 21, 2021), citing *Kimbrough v. Cincinnati Ass'n for Blind & Visually Impaired*, 986 F. Supp. 2d 904, 916 (S.D. Ohio 2013)). Both cases involved underlying claims that an employee was discriminated against because of a disability. The plaintiffs in both cases reported their opposition to the disabled employee's treatment and later alleged that their employers retaliated against them for their

---

[3] Although her reference may have been inapt, nonetheless it is clear she was seeking to enforce Title VII.

opposition. In both cases, an element to the plaintiff's claim required that the plaintiff know about the fired employee's disability before lodging a complaint. Neither of the plaintiffs knew about the fired employee's disability, so their claims failed. Neither *Persinger* nor *Kimbrough* involved a fact situation where a plaintiff spoke out about what she believed was an illegal hiring practice.

Plaintiff's repeated objections had nothing to do with Brown individually. Instead, they manifested her concern, as a member of the HR department, about the consequences of what to her appeared to be a systemic change in past practices.[4]

Plaintiff here has adequately set forth a *prima facie* case that she was opposing conduct that she reasonably believed violated Title VII. The content of her conversations with co-workers and superiors, as well as her email to Elliott, are sufficient to constitute opposition activity under Title VII. That she may have been wrong about what Title VII actually required in terms of job posting does not change this outcome.[5]

**Causal Connection**

Defendant's second challenge to Plaintiff's *prima facie* case is that Plaintiff has not set forth a causal connection between the protected activity and the materially adverse employment action.

At the outset, there is some confusion in the record about what event Plaintiff is claiming was the retaliatory action. Plaintiff's complaint identifies two potential retaliatory actions: (1) her demotion; and (2) her termination. Defendant points out that Plaintiff's counsel represented to me

---

[4] **The fact that she may have been mistaken in her premise does not deprive her of her right under Title VII to challenge UT's failure to post in this case. Retaliatory conduct following an employee's good faith, but possibly mistaken understanding of Title VII, is actionable. Moreover, neither party indicates that Defendant ever responded to Plaintiff with an indication that she was mistaken in her belief that this had a potential adverse impact going forward on prospective minority employees.**

[5] **To hold otherwise would potentially deter employees who have potentially meritorious concerns from voicing them.** *See e.g., Simpson v. Vanderbilt University*, **359 F. App'x 562, 570 (6th Cir. 2009) holding that the plaintiff's informal complaints about another individual's behavior constituted protected activity, even if the behavior complained of is ultimately found to be lawful.**

16

that her client does not take the position that her demotion was materially adverse. Rather, counsel represented that Plaintiff's focus is on her termination.

However, nothing in the written record on the docket reflects that Plaintiff is basing her retaliation claim on her termination only. Moreover, her opposition to Defendant's motion for summary judgment addresses both her demotion and termination. (*See* Doc. 31, PageID. 2710). So, I must presume that she is pursuing claims regarding her demotion and termination. I accordingly address both.

To establish the element of causal connection, Plaintiff "must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003). "One way by which a plaintiff can demonstrate a causal connection is to show close temporal proximity between the adverse employment actions and the protected activity." *Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013). However, the Sixth Circuit holds that, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

Plaintiff's argument for causal connection for both her demotion and termination is temporal proximity. (Doc. 31, PageID. 2709). The protected activity took place between October 5, 2020 and October 20, 2020. (*See*, *supra*.) On November 6, 2020, Defendant demoted Plaintiff. Defendant notified Plaintiff that she was fired over three-and-a-half months later, on February 9, 2021.

I find that Plaintiff has sufficiently set forth a temporal causal connection between her protected activity and her demotion. The demotion occurred less than two weeks after her last protected activity. This is close enough in time to satisfy a *prima facie* causal connection on its own.

However, Plaintiff needs more than just temporal proximity to demonstrate that her termination was connected to the protected activity because several months passed between the two events. The delay between the protected activity and the termination—nearly four months— is too long for temporal proximity alone to suffice for a causal connection. *See Kenney v. Aspen Technologies, Inc.*, 965 F.3d 443, 449 (6th Cir. 2020) ("[A] roughly 75-day delay between her protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation."); *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 550 (6th Cir. 2008) ("In this circuit, a period of more than four months was found to be too long to support an inference of causation.").

Plaintiff's additional evidence of a causal connection is not sufficient. First, she argues that: "The shadow of Matt Schroeder lurks behind both of the adverse actions suffered by Kovacs." (Doc. 31, PageID. 2710). However, no actual evidence supports her argument that Schroeder had a role in her termination. Rather, the record demonstrates that Beck and Elliott terminated Plaintiff; not Schroeder. Plaintiff's arguments that Schroeder was "enmeshed" in her termination are supposition and are unsupported.

Second, Plaintiff points to the fact that Defendant fired three Black employees, including Wynn, before Plaintiff was terminated on February 9, 2021. Wynn, as discussed, above, named Plaintiff in his complaint to the VP as an example of a Caucasian employee who Defendant demoted, rather than fired. Plaintiff argues that she was fired just days after Wynn's complaint.

18

Wynn complained to the VP and other Defendant employees on January 26 and 27, 2021. Defendant fired Plaintiff soon after on February 9, 2021. Plaintiff's argument is that the temporal proximity between Wynn's allegation of race discrimination and Plaintiff's firing is enough to establish cause. I disagree.

Plaintiff cites the case *Maseru v. Univ. of Cincinnati*, Case No. 18-cv-106, 2022 WL 7506368 (S.D. Ohio Oct. 13, 2022). There, the district court was tasked with deciding the defendant's motion *in limine*. The defendant sought to exclude other alleged acts of discrimination against the University at trial because such other acts were irrelevant, unfairly prejudicial, and potentially confusing to the jury under Federal Rule of Evidence 403. The district court agreed, except as to acts of discrimination in the same department as the plaintiff. The Court cited the following: "Evidence that an employer engaged in a pattern or practice of discrimination may be relevant to proving an otherwise-viable individual claim for disparate treatment under the *McDonnell Douglas* framework." *Megivern v. Glacier Hills Inc.*, 519 F. App'x 385, 399 (6th Cir. 2013).

Plaintiff here extrapolates this citation to stand for the proposition that evidence of a pattern of discrimination can be *prima facie* evidence supporting an individual claim for retaliation under Title VII. But that is not what the Court was evaluating in *Maseru*. Nor was the *Maseru* motion decided under the summary judgment standard applicable here. Plaintiff does not cite a case where a pattern or practice of discrimination can be used to overcome a motion for summary judgment on the causal connection element of a retaliation claim. A court's evaluation of a motion *in limine*, taken out of context, is not enough to meet Plaintiff's burden.

Again, it is Plaintiff's *prima facie* burden to demonstrate that her protected activity is causally linked to her termination. Temporal proximity is not sufficient where several months

19

passed between the protected activity and the termination. Vague accusations about Schroeder's lurking presence are not sufficient either. Plaintiff's argument regarding Wynn's complaint naming her is also insufficient because Plaintiff has not set forth a legal basis on which I can rely on this additional fact as cause for her firing.

Wynn complained to the VP of Diversity, the University President, and a Board Member. None of these three individuals are alleged to have any link, whatsoever, to Elliott and Beck's decision to terminate Plaintiff. Nor has Plaintiff set forth any evidentiary support that Elliott and Beck even knew about Wynn's complaint.

Accordingly, I find that Plaintiff has not set forth a *prima facie* case demonstrating a causal link between the protected activity and her termination. I grant summary judgment in Defendant's favor on Plaintiff's termination claim.

### b.    Legitimate Non-Retaliatory Reason and Pretext

Plaintiff has set forth a *prima facie* case for her demotion claim. Under *McDonnell Douglas*, "the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions. The defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times." *Mickey*, *supra*, at 526.

As set forth in the background section, above, Defendant has set forth several legitimate and non-retaliatory reasons for her demotion. These reasons include Plaintiff's failure to perform the two projects that Hurst and Elliott assigned to her. The projects were: (1) evaluating, formalizing, and managing Defendant's separation process; and (2) implementing a quarterly personnel action report for submission to UT's Board. Defendant also based its decision to demote Plaintiff on Elliott and Hurst's findings that Plaintiff's department performed poorly. Plaintiff did not remedy those performance issues through her work on the two assigned projects. Indeed,

Defendant indicates she failed to complete either project. Defendant determined that Plaintiff was not leadership material, so it demoted her to a non-supervisory role.

Under *McDonald Douglas*, now that Defendant has articulated a legitimate, non-retaliatory reason for her demotion, "the plaintiff may then show that the defendant's stated reason is merely a pretext for retaliation. *Mickey, supra*, at 526.

"A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2000). The "plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants ... did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.,* 258 F.3d 488, 493–94 (6th Cir. 2001) (internal quotations and citations omitted). To show an honest belief, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.,* 155 F.3d 799, 806–07 (6th Cir. 1998).

Plaintiff sets forth arguments under *Dews* categories (1) and (3). Plaintiff proffers the following arguments: (1) that employees who worked with Plaintiff for longer than Elliott and Hurst found her to be "a strong leader," an "outstanding supervisor and mentor" and "very approachable;" (2) that before she was demoted, Elliott and Hurst told Plaintiff she was doing "great;" (3) that Elliot did not assess Plaintiff; (4) Hurst, on the other hand, assessed Plaintiff. She did so, however, after only five weeks of observation; (5) "Kovacs, Reinhart, Fahey, Fisher and documentary evidence" contradicted the reasons Elliott and Hurst gave for demoting Plaintiff; and

(6) that Elliott and Hurst "owed their positions at the University solely to Schroeder." (Doc. 31, PageID. 2712–2713).

I find this issue to be a close one. Plaintiff's arguments that other employees found her leadership and mentoring to be "strong" or "outstanding" does not mean that her performance could not have been strong at times and be weak in other areas. That Elliott may have told Plaintiff that she was "great" when he first came on board could have been an off-hand comment rather than an evaluation of her performance. That Hurst observed Plaintiff for five weeks before evaluating her is not *per se* too short a time-period for a thorough evaluation, though, it clearly does not constitute Plaintiff's entire time at UT. Plaintiff also argues that there is "other documentary evidence" including testimony by herself and other employees that contradict Defendant's reasons for her demotion. But Plaintiff fails to explain what exactly that evidence is. It is Plaintiff's burden to do so. And lastly, Plaintiff's arguments that Elliott and Hurst's ties to Schroeder do not support her argument that she was demoted on a pretext because she has not set forth any evidence that Schroeder was a decisionmaker in Plaintiff's demotion.

In short, Plaintiff has set forth very little in terms of pretext to overcome Defendant's legitimate, non-retaliatory reasons for her demotion. Yet, it is not up to me to decide which side is more credible. That is the job of a jury. I find that the totality of the evidence in the record, when viewed in the light most favorable to Plaintiff, does not lead Defendant-favorable conclusion.

Accordingly, I decline to grant summary judgment in Defendant's favor on the issue of Plaintiff's demotion. *See Imwalle, supra*, at 551 (stating that, where the findings of pretext on summary judgment are a close call and ultimately come down to a credibility determination, the district court should not grant summary judgment in the defendant's favor).

### 4. Conclusion

Relative to the termination, I conclude that Plaintiff's showing that she engaged in a protected activity would clearly suffice. But Plaintiff fails to meet her burden of establishing a causal connection between the protected activity and her termination. In the Sixth Circuit, the temporal gap between the protected activity and her termination of nearly four months is too great to suffice as a causal connection on its own. As additional evidence of a link, Plaintiff discusses only suppositions and speculation about Schroeder, Wynn, Postel, and others. But she has not established that any of these individuals had anything to do with Elliott and Beck's decision to terminate her.

Relative to the demotion, I conclude that Plaintiff has met her *prima facie* burden under *McDonnell Douglas*.

It is, therefore,

ORDERED THAT:

1. Defendant's motion for summary judgment be, and hereby is, granted in part and denied in part. Defendant's motion is granted as to Plaintiff's termination claim and is denied as to Plaintiff's demotion claim.

SO ORDERED.

*/s/ James G. Carr*
Sr. U.S. District Judge